COOLEY LLP
MATTHEW D. BROWN (196972)
(brownmd@cooley.com)
ELIAS GARCIA (352669)
(elias.garcia@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: +1 415 693 2000
Facsimile: +1 415 693 2222

ROBBY L.R. SALDAÑA (356226)
(rsaldana@cooley.com)
1299 Pennsylvania Avenue, NW, Suite 700
Washington, D.C. 20004-2400
Telephone: +1 202 842 7800
Facsimile: +1 202 842 7899

Attorneys for Defendant
THE TOPPS COMPANY, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

DANIEL LANZARIN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

THE TOPPS COMPANY, INC.,

Defendant.

Case No. 3:26-cv-00063-RS

**THE TOPPS COMPANY, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY CASE**

Hearing Date: June 4, 2026
Time: 1:30 p.m.
Judge: Hon. Richard Seeborg
Date Action Filed: January 5, 2026

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1
II. FACTUAL BACKGROUND ........ 2
  A. The Topps Website. ........ 2
  B. Lanzarin Repeatedly Accepted The Topps Terms By Logging Into His Account. ........ 2
  C. The Topps Terms Have A Broad Arbitration Provision. ........ 4
  D. Lanzarin Did Not Opt Out Of The Arbitration Agreement. ........ 6
  E. Lanzarin Filed Suit Despite His Agreement To Arbitrate. ........ 7
III. LEGAL STANDARD ........ 7
IV. ARGUMENT ........ 8
  A. New York Law Governs Whether Plaintiff Entered Into A Valid Arbitration Agreement With Topps. ........ 8
  B. There Is A Binding Arbitration Agreement Between Lanzarin And Topps Under New York Law. ........ 10
    1. A Reasonably Prudent Person Would Be On Inquiry Notice Of The Topps Terms In The Topps Login Flow. ........ 11
    2. Lanzarin Unambiguously Manifested Assent To The Topps Terms By Repeatedly Logging Into His Account Multiple Times. ........ 13
  C. Even If California Law Applies, There Is Still A Binding Arbitration Agreement Between Lanzarin And Topps. ........ 14
    1. The Topps Login Flow Provides Reasonably Conspicuous Notice Of The Topps Terms. ........ 15
    2. Lanzarin Unambiguously Manifested Assent To The Topps Terms By Repeatedly Logging Into His Account Multiple Times. ........ 19
  D. The Delegation Clause Bars Plaintiff From Challenging The Scope Or Enforceability Of The Arbitration Agreement Here. ........ 20
  E. The Court Should Stay The Case Pending Arbitration. ........ 22
V. CONCLUSION ........ 23

# TABLE OF AUTHORITIES

## Cases

*Aceves v. Autonation, Inc.*,
317 F. App'x 665 (9th Cir. 2009) .................... 21

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
24 Cal. 4th 83 (Cal. 2000) .................... 22

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) .................... 10

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .................... *passim*

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
No. 17-CV-04570 (LAK) (KHP), 2017 WL 7309893 (S.D.N.Y. Nov. 20, 2017), *report and recommendation adopted as modified*, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) .................... 14

*Bielski v. Coinbase, Inc.*,
87 F.4th 1003 (9th Cir. 2023) .................... 21

*Bonhomme v. Uber Techs., Inc.*,
No. 24-cv-07998-JST, 2025 WL 1745729 (N.D. Cal. June 24, 2025) .................... 23

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) .................... 8

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
No. C 04-04825 JW, 2005 WL 756610 (N.D. Cal. Apr. 1, 2005) .................... 17

*Caremark, LLC v. Chickasaw Nation*,
43 F.4th 1021 (9th Cir. 2022) .................... 8

*Chavarria v. Ralphs Grocery Co.*,
733 F.3d 916 (9th Cir. 2013) .................... 22

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) .................... 7

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023) .................... 10, 11, 12, 13

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012) .................... 12

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) .......... 19

*Gillman v. Chase Manhattan Bank, N.A.*,
73 N.Y.2d 1 (1988) .......... 22

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) .......... *passim*

*Gonzalez v. Hoovestol, Inc.*,
No. 1:23-cv-00202-JLT-CDB, 2024 WL 1722333 (E.D. Cal. Apr. 19, 2024) .......... 8

*Graham v. Bloomberg L.P.*,
No. 22-CV-7015 (VSB), 2023 WL 6037974 (S.D.N.Y. Sept. 15, 2023) .......... 12

*Greenberg v. Amazon.com, Inc.*,
No. 20-cv-02782-JSW, 2021 WL 7448530 (N.D. Cal. May 7, 2021) .......... 15

*Harper v. Charter Communications, LLC*,
No. 2:19-cv-01749 WBS DMC, 2019 WL 6918280 (E.D. Cal. Dec. 19, 2019) .......... 22

*Hu v. Whaleco, Inc.*,
779 F. Supp. 3d 265 (E.D.N.Y. 2024) .......... 11, 13

*Hughes Electronics Corp. v. Citibank Delaware*,
120 Cal. App. 4th 251 (2004) .......... 9

*Karim v. Best Buy Co., Inc.*,
No. 22-cv-04909-JST, 2023 WL 3801909 (N.D. Cal. June 2, 2023) .......... 9

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) .......... *passim*

*Kroskey v. Elevate Labs, LLC*,
No. 5:24-cv-08113-EJD, 2025 WL 1507091 (N.D. Cal. May 27, 2025) .......... 16, 20

*L.W.A. v. LinkedIn Corp.*,
No. 5:24-cv-08436-EJD, 2025 WL 2780788 (N.D. Cal. Sept. 30, 2025) .......... 19

*Long v. Provide Commerce, Inc.*,
245 Cal. App. 4th 855 (2016) .......... 15

*Meyer v. Uber Tech., Inc.*,
868 F.3d 66 (2d Cir. 2017) .......... 10, 11, 12

*Mohamed v. Uber Techs., Inc.*,
848 F.3d 1201 (9th Cir. 2016) .......... 21, 22

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*,
460 U.S. 1 (1983) .......... 7

*Nedlloyd Lines B.V. v. Superior Ct.*,
3 Cal. 4th 459 (1992) .......... 9

*Needleman v. Golden 1 Credit Union*,
474 F. Supp. 3d 1097 (N.D. Cal. 2020) .......... 21

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .......... 9

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) .......... 14, 15, 19, 20

*OTO, L.L.C. v. Kho*,
8 Cal. 5th 111 (2019) .......... 22

*Pinela v. Neiman Marcus Grp., Inc.*,
238 Cal. App. 4th 227 (2015) .......... 9

*Pizarro v. QuinStreet, Inc.*,
No. 22-cv-02803-MMC, 2022 WL 3357838 (N.D. Cal. Aug. 15, 2022) .......... 16

*Pokorny v. Quixtar, Inc.*,
601 F.3d 987 (9th Cir. 2010) .......... 8, 9

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) .......... 10, 14

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) .......... 14, 17, 18, 19

*Shearson/Am. Express, Inc. v. McCahon*,
482 U.S. 220 (1987) .......... 7

*Shugars v. Walmart Inc.*,
2025 WL 786348 (N.D. Cal. Mar. 12, 2025) .......... 22

*Singh v. Adobe Inc.*,
797 F. Supp. 3d 1038 (N.D. Cal. 2025) .......... 21, 23

*Smith v. Inflection Risk Solutions, LLC*,
No. 25-cv-07620-TSH, 2026 WL 622116 (N.D. Cal. Mar. 5, 2026) .......... 8

*Smith v. Spizzirri*,
601 U.S. 472 (2024) .......... 22

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002) .......... 12

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019) .......... 11

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468 (1989) ........ 8

**Statutes**

9 U.S.C.
§ 1 ........ 1
§ 2 ........ 7
§ 3 ........ 23

Cal. Civ. Code § 1550 ........ 14

**Other Authorities**

Restatement (Second) of Conflict of Laws § 187 (1971) ........ 9

## NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

PLEASE TAKE NOTICE that on June 4, 2026 at 1:30 p.m., or as soon thereafter as this motion may be heard in the above Court, located at Courtroom 12, 19th Floor, United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, Defendant The Topps Company, Inc. ("Topps") will move for an order compelling arbitration of all claims asserted against Topps in the Complaint by Plaintiff Daniel Lanzarin. Topps further requests a stay of all proceedings pending arbitration pursuant to Section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*. This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities herein, the Declarations of Matthew D. Brown ("Brown Decl.") and Aaron Craig ("Craig Decl."), all supporting papers, and any other materials and argument as may be presented to the Court in connection with this Motion.

## STATEMENT OF RELIEF SOUGHT

Topps seeks an order compelling arbitration of Plaintiff's claims and a stay of the case pending resolution of arbitration.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This putative class action should not proceed in this Court, nor should this Court be burdened with this lawsuit, because Plaintiff Daniel Lanzarin agreed that any disputes between Topps and him must be resolved in arbitration. Lanzarin brings several claims stemming from his use of the Topps website to purchase a trading card, during which he alleges that certain non-parties allegedly unlawfully intercepted his electronic communications with the Topps website via alleged tracking technologies installed on the website. Lanzarin omits from the Complaint the fact that he has a Topps account, which he logged into multiple times before bringing this lawsuit. He could not log into his account without first agreeing to the Topps Terms of Service (the "Topps Terms" or "Terms"). The Terms contain an arbitration agreement (the "Arbitration Agreement" or "Agreement"), which requires that ***any*** disputes between Lanzarin and Topps be resolved by arbitration on an individual basis. Lanzarin logged into his account multiple times and repeatedly assented to the Topps Terms that were conspicuously displayed on the webpage and governed his

ongoing access to and use of the Topps website. Lanzarin had the opportunity to opt out of arbitration, but never did so. If Lanzarin had complied with the terms of the Arbitration Agreement, he would not have brought this lawsuit and both sides would save the time and money of litigating this case. While Lanzarin may challenge the scope and enforceability of the Arbitration Agreement, the Agreement delegates those issues to the arbitrator alone. Thus, the Court should enforce the Arbitration Agreement, compel arbitration of Lanzarin's claims, and stay the case pending resolution of arbitration.

## II. Factual Background

### A. The Topps Website.

Topps is a Delaware corporation headquartered in New York, New York. Dkt. No. 1 ("Compl."), ¶ 9. It operates the Topps website (www.topps.com), where customers may purchase trading cards, collectibles, customs cards, and memorabilia, among other items.

### B. Lanzarin Repeatedly Accepted The Topps Terms By Logging Into His Account.

Plaintiff is a resident of Belmont, California. Compl. ¶ 6. Years before making the purchase on the Topps website alleged in the Complaint, Lanzarin registered a Topps account in or around August 4, 2022, the date of his first purchase from Topps. Craig Decl. ¶ 6. On October 29, 2025, he allegedly accessed the Topps website from California to purchase the 2025 "Topps Now" World Series Shohei Ohtani trading card. Compl. ¶ 7. A query of Topps' records shows that after this purchase Lanzarin logged into his account on the Topps website six times between October 31, 2025 and December 23, 2025 using desktop and mobile browsers. Craig Decl. ¶ 8. His two logins on December 23, 2025 were less than two weeks before he filed this case. *Compare id.*, *with* Dkt. No. 1.

Lanzarin had to agree to the Topps Terms each time he logged into his account, whether he used a desktop web browser or mobile web browser. Craig Decl. ¶¶ 11-20. First, when a user logs into his account, he is presented with a webpage requesting that he enter his email address. Craig Decl. Ex. 1 at 2. The webpage explains that "If you don't have an account, we'll prompt you to create one." *Id.* The "Continue" button is in a gray color against a white background, and the button

turns black only when an email address is entered. *Id*. Second, after the user clicks the black "Continue" button, the user is presented with the webpage below.




***Topps Login Page (Desktop)***

*See also* Ex. 1 at 3. The webpage has the Fanatics ONE[1] logo at the top followed by the heading "Enter your password." The "Log In" button is in a gray color against a white background, and the button turns black only when text is entered into the password box. Immediately below the "Log In" button appeared the phrase "By continuing, you agree to the Topps Terms and Privacy Policy." The underlined words are hyperlinks. Clicking on "Terms" opens a new tab in a web browser, which displays the Topps Terms last updated on September 5, 2025, which include the Arbitration Agreement at issue here. A user is free to spend as much time as he wishes reviewing the Terms.

The login flow is substantially similar in a mobile web browser, with the key difference being the mobile-sized display of the webpage, as shown in the screenshot below. *See* Craig Decl. Ex. 2. at 1. Tapping on the word "Terms" opens a new tab in the mobile web browser, which displays the Topps Terms last updated on September 5, 2025, which include the Arbitration Agreement at issue here. Again, a user is free to spend as much time as he wishes reviewing the Terms.

---

[1] Fanatics, Inc. acquired Topps in 2022. *See* Fanatics, *Topps*, https://www.fanaticsinc.com/topps.




***Topps Login Page (Mobile)***

The Topps Terms explain that they "contain the binding terms and conditions between you and The Topps Company, Inc. ('Topps') applicable [to] your access to and use of this website, www.Topps.com, including the mobile version . . . ." Ex 3. at 1. The Terms further provide that "[a]ny obligation based upon these Terms has been entered into, and shall be construed, enforced, and governed in accordance with the laws of the State of New York, without regard to conflicts of laws principles." Craig Decl. Ex. 3 at 32, § 25.

### C. The Topps Terms Have A Broad Arbitration Provision.

The Topps Terms expressly and repeatedly advise customers about the existence, scope, and nature of the Arbitration Agreement. The introduction to the Terms advises as follows:

> PLEASE NOTE THAT THESE TERMS INCLUDE A MANDATORY ARBITRATION PROVISION WHICH REQUIRES THAT ANY PAST, PENDING, OR FUTURE DISPUTES BETWEEN YOU AND US SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION ON AN INDIVIDUAL BASIS . . . .

Ex. 3 at 1-2. The introduction also advises customers of the ability to opt out of arbitration within 30 days by following the instructions set forth in "THE SECTION ENTITLED 'BINDING ARBITRATION AND CLASS WAIVER.'" *Id*. at 2.

Thereafter, the Terms use a header to identify the Arbitration Agreement with capitalized and bolded wording: "18. **BINDING ARBITRATION AND CLASS ACTION WAIVER AGREEMENT**." *Id*. at 22. Section 18. 2 of the Arbitration Agreement sets forth the broad scope of the Agreement:

> You and Topps agree that any past, pending, or future dispute, claim or controversy arising out of or relating to any purchase or transaction by you, your access to or use of any Properties or the Services, or to this Arbitration Agreement, the Terms, or the Supplemental Terms (including without limitation any dispute concerning the breach, enforcement, construction, validity, interpretation, enforceability, or arbitrability of this Arbitration Agreement or the Terms) (a "Dispute"), shall be determined by arbitration, including claims that arose before acceptance of any version of this Arbitration Agreement.

*Id*. at 23.

The Arbitration Agreement also contains a broad delegation clause ("Delegation Clause"):

> In addition, in the event of any Dispute concerning or relating to this Arbitration Agreement — including the scope, validity, enforceability, or severability of this Arbitration Agreement or its provisions, as well as the arbitrability of any claims— you and Topps agree and delegate to the Arbitrator the exclusive jurisdiction to rule on their own jurisdiction over the Dispute, including any objections with respect to the scope, validity, enforceability, or severability of this Arbitration Agreement or its provisions, as well as the arbitrability of any claims or counterclaims presented as part of the Dispute.

*Id.*

The Arbitration Agreement further provides that a consumer "MAY ONLY ARBITRATE OR LITIGATE ON AN INDIVIDUAL BASIS AND FOR YOUR OWN LOSSES ONLY." *Id.* at 28. "UNDER THIS ARBITRATION AGREEMENT, YOU MAY NOT PROCEED IN ARBITRATION OR COURT AS A CLASS REPRESENTATIVE, MEMBER OR PART OF ANY PROPOSED CLASS . . . ." *Id.* Under the Agreement, both "YOU AND TOPPS ARE EACH WAIVING THEIR RESPECTIVE RIGHTS TO PARTICIPATE IN A CLASS ACTION." *Id.*

The Topps Terms contain multiple provisions that repeatedly advise customers of the retroactive application of the Arbitration Agreement. *See* Ex. 3 at 2 ("IF YOU DO NOT WISH TO

BE SUBJECT TO ARBITRATION ON A RETROACTIVE BASIS AND AS TO ANY FUTURE CLAIMS AND YOU HAVE NOT PREVIOUSLY AGREED TO AN ARBITRATION PROVISION IN CONNECTION WITH YOUR USE OF THE PROPERTIES, YOU MAY OPT OUT OF THE ARBITRATION PROVISION WITHIN 30 DAYS BY FOLLOWING THE INSTRUCTIONS PROVIDED IN THESE TERMS WITHIN THE SECTION ENTITLED 'BINDING ARBITRATION AND CLASS WAIVER."); *id.* at 22 ("THIS ARBITRATION AGREEMENT APPLIES TO ANY CLAIMS YOU MAY CURRENTLY POSSESS AND ANY CLAIMS YOU MAY RAISE IN THE FUTURE."); *id.* at 27 ("IF YOU HAVE NOT PREVIOUSLY AGREED TO AN ARBITRATION PROVISION IN CONNECTION WITH YOUR USE OF OUR SERVICE, YOU MAY OPT OUT OF THE AGREEMENT TO ARBITRATE BY FOLLOWING THE INSTRUCTIONS BELOW. IF YOU DO NOT OPT-OUT, THE ARBITRATION PROVISIONS WILL APPLY RETROACTIVELY TO ALL CLAIMS YOU MAY POSSESS, WHETHER ASSERTED TO DATE OR NOT.").

Further, the Arbitration Agreement provides: "[w]hile the Federal Arbitration Act shall control, to the extent the law of any state is applied or considered with respect to issues bearing upon the enforceability or scope of this Arbitration Agreement, the parties agree that the law of the State of New York shall exclusively apply, notwithstanding any consideration or application of choice of law or conflicts of law principles." *Id*. at 24, § 18.7.

**D. Lanzarin Did Not Opt Out Of The Arbitration Agreement.**

The Topps Terms allow a user to opt out of arbitration in Section 18.11 of the Arbitration Agreement, which is titled: "OPTION AND PROCEDURE TO OPT OUT OF ARBITRATION." *Id.* at 27. If a user has not previously agreed to an arbitration provision with Topps, the customer may opt out of the Arbitration Agreement by following the requisite procedure. *Id.* The user must send a written opt-out notice top opt-out-arb@collectfanatics.com within thirty days of entering the agreement. *Id.* If the user fails to opt out, the Arbitration Agreement "will apply retroactively to all claims you may possess, whether asserted to date or not." *Id*. Topps records all opt-out requests that it receives from users. Craig Decl. ¶ 25. Topps has no record of Lanzarin ever opting out of the Arbitration Agreement. *Id.* ¶ 26.

### E. Lanzarin Filed Suit Despite His Agreement To Arbitrate.

Despite repeatedly agreeing to the Arbitration Agreement, Lanzarin filed this putative class action on January 5, 2026, alleging that non-parties Meta Platforms, Inc. and Amplitude, Inc. intercepted or recorded his electronic communications through pixels allegedly located on the Topps website. Compl. ¶ 1. Lanzarin contends that Topps disclosed his personal information without his consent. Lanzarin asserts violations of the federal Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511, *et seq.*, the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 632, the California Comprehensive Computer Data and Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, and invasion of privacy in violation of the California Constitution. Compl. ¶¶ 132-207.

Before moving to compel arbitration, counsel for Topps inquired whether Lanzarin would agree to arbitrate his claims to avoid the potential need for a motion to compel arbitration. Brown Decl. ¶ 2. Through counsel, Plaintiff elected to oppose this motion. *Id.* ¶ 3. As a result, Topps is forced to file this motion to compel arbitration.

## III. Legal Standard

The FAA applies to written contracts "evidencing a transaction involving commerce." 9 U.S.C. § 2. Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id*. The FAA establishes a "federal policy favoring arbitration" and requires courts to "rigorously enforce agreements to arbitrate." *Shearson/Am. Express, Inc. v. McCahon*, 482 U.S. 220, 226 (1987). A motion to compel arbitration under the FAA is intended to "move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp*., 460 U.S. 1, 22 (1983).

On a motion to compel arbitration, a court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc*., 207 F.3d 1126, 1130 (9th Cir. 2000). "[T]hese gateway issues can be expressly delegated to the arbitrator where 'the parties *clearly and unmistakably* provide otherwise.'" *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015)

(emphasis in original) (citation omitted). If the party opposing arbitration challenges the formation of an agreement to arbitrate and the enforceability of a delegation clause, "a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022). "Next, a court must also resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability." *Id.* "[I]f the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide. . . ." *Id.*

In deciding a motion to compel arbitration, courts must treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party. *Smith v. Inflection Risk Solutions, LLC*, 2026 WL 622116, at *4 (N.D. Cal. Mar. 5, 2026). A court may consider evidence outside the pleadings when ruling on a motion to compel arbitration. *Id.*

## IV. ARGUMENT

### A. New York Law Governs Whether Plaintiff Entered Into A Valid Arbitration Agreement With Topps.

The Court must determine whether a valid arbitration agreement exists between Lanzarin and Topps. Courts use state-law principles to determine if a valid agreement to arbitrate exists, while giving "due regard" to "the federal policy favoring arbitration." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 475-76 (1989). "Before a federal court may apply state-law principles to determine the validity of an arbitration agreement, it must determine which state's laws to apply." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010). When a federal court has federal question jurisdiction and supplemental jurisdiction over related state-law claims, it applies choice-of-law rules of the state forum. *See Gonzalez v. Hoovestol, Inc.*, 2024 WL 1722333, *7 (E.D. Cal. Apr. 19, 2024). Lanzarin brings both federal and state claims. *See* Compl. ¶¶ 132-51 (federal Electronic Communications Privacy Act claim); *id.* ¶¶ 164-207 (various state-law claims). Thus, the Court should apply California choice-of-law rules.

"Under California law, the choice-of-law rules differ depending on whether the parties have

included a choice-of-law agreement in their contract." *Pokorny v. Quixtar, Inc.*, 601 F.3d at 994. As is relevant here, the Arbitration Agreement in the Topps Terms contain a choice-of-law provision that selects New York law as the governing law[2]:

> "18.7. Applicable Law. While the Federal Arbitration Act shall control, to the extent the law of any state is applied or considered with respect to issues bearing upon the enforceability or scope of this Arbitration Agreement, the parties agree that the law of the State of New York shall exclusively apply, notwithstanding any consideration or application of choice of law or conflicts of law principles."

Ex. 3 at 24. California law requires a court to enforce a contractual choice-of-law provision unless Section 187(2) of the Restatement (Second) of Conflict of Laws dictates a different result. *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 464-65 (1992). Under the Restatement, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied" unless: (a) the chosen state has no substantial relationship to the parties or transaction and there is no reasonable basis for the parties' choice, or (b) application of the chosen state's law would violate a fundamental policy of California. *Id.* at 465; *see also* Restatement (Second) of Conflict of Laws § 187 (1971). The Restatement does not dictate non-enforcement of the New York choice-of-law provision in the Topps Terms.

First, New York has a substantial relationship to the Parties because it is where Topps is headquartered. Compl. ¶ 9. "There is no question" that a state where a party is headquartered "has a substantial relationship to the parties." *Pinela v. Neiman Marcus Grp., Inc.*, 238 Cal. App. 4th 227, 257 (2015); *see also Hughes Electronics Corp. v. Citibank Delaware*, 120 Cal. App. 4th 251, 258 (2004) ("Citibank's principal place of business is in New York. This fact alone is sufficient to establish a 'substantial relationship' between New York and the parties as well as a 'reasonable basis' for a contractual provision requiring application of New York law.").

---

[2] The Ninth Circuit has opined that "whether the choice of law provision applies depends on whether the parties agreed to be bound by [the Agreement] in the first place." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014); *Karim v. Best Buy Co., Inc.*, 2023 WL 3801909, at *2 (N.D. Cal. June 2, 2023). This inquiry has been described as "circular" when a court must decide whether a plaintiff formed an agreement with a defendant in the first place. *See Karim*, 2023 WL 3801909, at *2. As discussed below, Lanzarin assented to the Topps Terms under both New York law and California law contract formation principles. *See infra* Parts IV.B and IV.C.

Second, the application of New York law does not violate a fundamental policy of California. Both states' policies regarding assent to arbitration agreements are substantively the same, and the result of compelling this arbitration agreement does not otherwise violate California policy. California and New York law have analogous approaches to contract formation. *See Meyer v. Uber Tech., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) ("New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term."); *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) ("[B]oth California and New York law dictate the same outcome."). The result of either state's law is the same: enforcement of the binding and valid Arbitration Agreement between Lanzarin and Topps. Thus, the Court should apply New York law.

### B. There Is A Binding Arbitration Agreement Between Lanzarin And Topps Under New York Law.

There exists a valid arbitration agreement between Lanzarin and Topps under New York law. "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427-28 (2d Cir. 2004). "The manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract." *Id.* at 427. These rules apply to online agreements. The agreement to the Topps Terms via the Topps login is a "sign-in-wrap" agreement, *i.e.*, an agreement in which a website provider notifies a user of the existence and applicability of the website's terms of use when proceeding through the website's sign-in or login process. *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015). A sign-in wrap agreement "can validly bind a user to a website's Terms of Use if "(1) a reasonably prudent person would be on *inquiry* notice of the terms, and (2) the user unambiguously manifests assent through conduct that a reasonable person would understand to constitute assent." *Edmundson v. Klarna, Inc*., 85 F.4th 695, 703 (2d Cir. 2023) (emphasis in original) (internal citations and quotations omitted). "Both inquiries . . . are generally measured by an objective standard, and are clearly . . . fact-intensive." *Hu v. Whaleco, Inc.*, 779 F. Supp. 3d 265, 284 (E.D.N.Y. 2024) (internal quotations omitted). An evaluation of each inquiry shows that Lanzarin assented to the Topps

Terms, including the Arbitration Agreement, by logging into his account on the Topps website.

**1. A Reasonably Prudent Person Would Be On Inquiry Notice Of The Topps Terms In The Topps Login Flow.**

Under New York law, courts look to the design and content of a website to determine if the contract terms were presented to a user in way that would put the user on inquiry notice of such terms. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). Courts applying New York law focus on the "totality of the circumstances." *Edmundson*, 85 F.4th at 707. This includes whether the relevant screen is "uncluttered," whether the notice and hyperlinked terms are conspicuous in light of the whole webpage (given the capitalization, bolding, underlining, sizing, and font), whether the user needs to scroll to see the hyperlinked terms, and whether the notice and hyperlinked terms are closely located to the assent mechanism (here, the sign-in button). *Hu*, 779 F. Supp. 3d 285-86. The analysis is not formulaic as "there are infinite ways to design a website or smartphone application." *Meyer*, 868 F.3d at 75.

The design and content of the webpage on which the Topps Terms appear in the Topps login flow clearly put a reasonably prudent user on notice of those Terms.

First, the overall design of the webpage with the Topps Terms is uncluttered. Ex. 1 at 3. It has a Fanatics ONE logo at the top, the heading "Enter your password," a display of the email entered on the prior page, a box to enter a password, the phrase "Not you?", the phrase "Reset password," and a "Log In" button. *Id*. (underlining in original). The button is a gray color until the user enters a password, at which point the button turns black. Craig Decl. ¶ 14. Immediately below the button is the phase "By continuing, you agree to the Topps Terms and Privacy Policy." *Id*. (underlining in original). Rather than burying the Topps Terms, they are "visible at once, and the user does not need to scroll beyond what is immediately visible to find notice" of them. *See Meyer*, 868 F.3d at 78 (concluding that a screen interface was uncluttered when it had "only fields for the user to enter his or her credit card details, buttons to register for a user account or to connect the user's pre-existing PayPal account or Google Wallet to the Uber account," and a hyperlinked terms of service); *see also Edmundson*, 85 F.4th at 706 ("[B]ecause the interface does not include a plethora of clutter or extraneous information, the notice to Klarna's terms -- even if in a smaller

font -- appears sufficiently 'conspicuous in light of the whole [interface].'").

Second, the webpage draws attention to the hyperlinked Topps Terms. The phrase "Topps Terms" is in the same font as nearly all the text on the page and the word "Terms" is underlined. Ex. 1 at 3. In the context of a webpage, underlined text is "an indication that the phrase is a hyperlink, a phrase that is 'usually highlighted or underlined' and 'sends users who click on it directly to a new location—usually an internet address or a program of some sort.'" *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (quoting *United States v. Hair*, 178 F. App'x 879, 882 n.3 (11th Cir. 2006)). "The font size and use of underlining helps put a user on inquiry notice." *Graham v. Bloomberg L.P.*, 2023 WL 6037974, at *5 (S.D.N.Y. Sept. 15, 2023). And the font size need not be consistent across all text used on a webpage for it to put a user on notice. *See id.* ("Although this text is not written in a font as large as the page headers, it is in a font size comparable to numerous other text items on that screen such as billing and subscription information."). The color contrast of "black text on white background" of the hyperlinked Topps Terms further makes the Terms conspicuous. *See Edmundson*, 85 F.4th at 706 ("Although the hyperlinks to Klarna's terms are in a smaller font relative to other text on the Klarna Widget, they are set apart from surrounding information by being underlined and in a color that stands in sharp contrast to the color of the interfaces' backgrounds.").

Third, the webpage displays the hyperlinked Topps Terms in close proximity to the assent mechanism. The hyperlinked Terms appear directly below the "Log In" button. Ex. 1 at 3. This close proximity of the Terms to the assenting mechanism (the sign-in button) further demonstrates that a reasonably prudent user would have been aware of the hyperlink. *See Meyer*, 868 F.3d at 78 (approving of a notice of terms and conditions that was directly adjacent to the button intended to manifest assent to those terms). Moreover, a user does not need to scroll to see the hyperlinked Terms. *Cf. Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 31-32 (2d Cir. 2002) (holding there was no inquiry notice of contract terms that were provided via hyperlink at the very bottom of a webpage which distracted viewer with praise for the product and a "Download" button).

Thus, when considering the relevant factors under New York law, a reasonably prudent user who logged into their account via the Topps login flow was on inquiry notice of the Topps Terms,

including the Arbitration Agreement.

**2. Lanzarin Unambiguously Manifested Assent To The Topps Terms By Repeatedly Logging Into His Account Multiple Times.**

Under New York law, a court considers various factors to determine whether a party assented to an online agreement, including:

> (1) whether the interface clearly warned the user that taking a specific action would constitute assent to certain terms; (2) whether notice of the contractual terms was presented to the consumer in a location on the interface and at [a] time when the consumer would expect to receive such terms; and (3) the 'course of dealing between the parties,' including whether the contract terms were conspicuously presented to the consumer at each use of the offeror's service and the consumer's conduct in response to the repeated presentation of conspicuous terms.

*Hu*, 779 F. Supp. 3d at 293 (citing *Edmundson*, 85 F.4th at 704-05). Application of these factors confirms that Lanzarin assented to the Topps Terms, including the Arbitration Agreement.

First, a reasonable user would understand that logging into his account on the Topps website constitutes assent to the Topps Terms. An interface need only "'make clear' to the reasonable internet user that a specific 'click' signifies assent." *Edmundson*, 85 F.4th at 708. The webpage here explicitly advises a user in language immediately below the "Log In" button that "By continuing, you agree to the Topps <u>Terms</u> and <u>Privacy Policy</u>." Ex. 1 at 3. A reasonable user could not avoid notice of the Terms, which were hyperlinked in the statement and placed in close proximity to the "Log In" button on a webpage that is uncluttered. *See Edmundson*, 85 F.34th at 707-08 (concluding that "a reasonable user could not avoid the notice of Klarna's terms" where webpage had similar design elements). And the Terms were presented on the login page, where a user could assent by logging in. *See Hu*, 779 F. Supp. 3d at 294-95 (finding that plaintiffs demonstrated unambiguous assent to a website's terms because "Plaintiffs were presented with the notice and hyperlink to the Terms each time they logged in to the Temu App").

Second, the "transactional context of the parties' dealings reinforces" that Lanzarin unambiguously manifested assent to the Topps Terms. *See id.* Lanzarin logged into his account on the Topps website six times between October 31, 2025 and December 23, 2025. Decl. ¶¶ 7-8. The login flow would have been the same during the time period that Lanzarin logged into his account

on the Topps website and would have appeared as shown in Exhibits 1 and 2. Craig Decl. ¶ 10; Exs. 1, 2. Before proceeding to the webpage with the Topps Terms, Lanzarin had to enter his own email address. Once on the webpage with the Topps Terms, Lanzarin had to click the "Log In" button to continue logging into his account. By logging into his account multiple times, Lanzarin was repeatedly exposed to the Topps Terms. *See Register.com*, 356 F.3d at 431 (assent may be shown through "repeated exposure to the terms and conditions"). And he repeatedly took the very action linked with assenting to those Terms. *See Bernardino v. Barnes & Noble Booksellers, Inc.*, 2017 WL 7309893, at *11 (S.D.N.Y. Nov. 20, 2017) ("Bernardino in fact submitted her order and purchased the DVD—taking the very action linked with assenting to the TOU."), *report and recommendation adopted as modified*, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018).

Thus, Lanzarin unambiguously manifested his assent to the Topps Terms by logging into his account multiple times and the Court must compel arbitration of his claims.

### C. Even If California Law Applies, There Is Still A Binding Arbitration Agreement Between Lanzarin And Topps.

Even if the Court were to apply California law to determine whether Lanzarin assented to the Arbitration Agreement in the Topps Terms, there is a still a binding arbitration agreement between Lanzarin and Topps. Under California law, a contract requires (1) parties capable of contracting; (2) consent; (3) a lawful object; and (4) consideration. Cal. Civ. Code § 1550. There "must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512-13 (9th Cir. 2023).

Similar to New York law, "[i]n California, internet contracts are classified 'by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps.'" *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021)). As discussed above, the agreement at issue here is a sign-in wrap agreement.[3] *See supra* Part IV.B.1; *see also Keebaugh*, 100 F.4th at 1014 (in such an agreement, "users are required to advance through

[3] These types of agreements are also referred to as "modified clickwrap agreements." *See Greenberg v. Amazon.com, Inc.*, 2021 WL 7448530, at *4 & n.4 (N.D. Cal. May 7, 2021).

a sign-in screen which states [‘By clicking Sign Up’ (or in some cases ‘By clicking Continue’)] ‘I agree to the Terms of [Use including the arbitration clause.]’”). A sign-in wrap agreement is enforceable under California law based on inquiry notice if “(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.” *Keebaugh*, 100 F.4th at 1014. As is relevant here, whether a hyperlink to a website’s Terms of Use is sufficiently conspicuous under California law is a pure question of law if the “material evidence consists exclusively of screenshots from the Web site . . . and the authenticity of these screenshots is not subject to factual dispute.” *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 863 (2016) (describing this as a “pure question of law”).

**1. The Topps Login Flow Provides Reasonably Conspicuous Notice Of The Topps Terms.**

In evaluating whether notice of online contractual terms is sufficiently conspicuous, courts applying California law consider the “context of the transaction” and “the visual aspects of the notice.” *Keebaugh*, 100 F.4th at 1019. “Both aspects ‘should be considered together.’” *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025) (citation omitted). An evaluation of each factor confirms that the Topps login flow provides reasonably conspicuous notice of the Topps Terms to a reasonably prudent user.

***Visual Conspicuousness.*** The visual conspicuousness factor concerns “whether an advisal is ‘displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.’” *Id.* (quoting *Berman*, 30 F.4th at 856). Under California law, this inquiry is “fact-intensive” and is informed by the “totality of the circumstances.” *Oberstein*, 60 F.4th at 514. This analysis considers the “overall screen design.” *Keebaugh*, 100 F.4th at 1019. Courts consider various factors, including the location of the notice on the webpage, the font size, color, and contrast against the webpage background. *See Godun*, 135 F.4th at 710; *Keebaugh*, 100 F.4th at 1019. The law is clear that there is no “checklist for website designers,” nor are there “per se rules about what’s necessarily inadequate, either. Such a one-size-fits-all approach would undermine the fact-intensive, totality-of-the-circumstances nature of the analysis.” *Godun*, 135

F.4th at 710.

The totality of the circumstances here shows that the Topps login webpage provides reasonably conspicuous notice of the Topps Terms to a reasonably prudent consumer.

The webpage with the Topps Terms lacks clutter. *See Keebaugh*, 100 F.4th at 1021 ("Unlike the notices at issue in *Berman*, the sign-in screen here lacks clutter and uses '[c]ustomary design elements denoting the existence of a hyperlink.'"). Ex. 1 at 3. The webpage has a Fanatics ONE logo, the heading "Enter your password," a display of the email entered on the prior page, a box to enter a password, the phrase "Not you?", the phrase "Reset password," and a "Log In" button. Ex 1 at 3 (underlining in original). The button is a gray color until the user enters a password, at which the button turns black. Craig Decl. ¶ 14. Immediately below the button is the phrase "By continuing, you agree to the Topps Terms and Privacy Policy." *Id.* (underlining in original). The "general design of the website" is "relatively uncluttered and has a muted, and essentially uniform, color scheme." *Pizarro v. QuinStreet, Inc.*, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022) (granting motion to compel arbitration).

Appearing on this uncluttered webpage is a readily apparent hyperlink to the Topps Terms. *Keebaugh*, 100 F.4th at 1014 ("[T]he presence of a hyperlink 'must be readily apparent.'"). Directly beneath the "Log In" button is the following phrase in the same font size as most other font on the webpage: "By continuing, you agree to the Topps Terms and Privacy Policy." The hyperlinked word "Terms" is underlined, making it stand apart on the screen. *See Pizarro*, 2022 WL 3357838, at *3 ("[T]he instant hyperlink, although the same color as the rest of the textual notice, is underlined and adequately contrasted with the white background, such that a user would not 'be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to ferret out hyperlinks.'"); *see also Kroskey v. Elevate Labs, LLC*, 2025 WL 1507091, at *4 (N.D. Cal. May 27, 2025) ("[W]hile the hyperlinks are not marked in blue or underlined, they are in bold with the first letters capitalized, making them stand apart from the other text in the sentence. In the context of the clean and simple format of the page, the Court finds that a reasonably prudent internet user would see the notice and understand that the phrase 'Terms & Conditions' was a hyperlink to the Terms of Service containing the Arbitration Clause."); *Cairo,*

*Inc. v. Crossmedia Servs., Inc.*, 2005 WL 756610, at *2 (N.D. Cal. Apr. 1, 2005) (terms were underlined and hyperlinked).

Plaintiff may attempt to grasp onto a statement in the Ninth Circuit's *Berman* decision to argue that the underlining of the Topps Terms is insufficient to make them sufficiently conspicuous under California law. Specifically, in *Berman*, a Ninth Circuit panel opined that "[s]imply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists." 30 F.4th at 857 (citing *Sellers*, 73 Cal. App. 5th at 481). Respectfully, this Court should reject any attempt by Plaintiff to rely on this dictum to craft a categorical rule that the underlining of the Topps Terms on the login page is not sufficiently conspicuous. As Ninth Circuit Judge Ryan D. Nelson recently explained in a concurrence in *Godun*, the language in *Berman* is "problematic" because it "is neither true as a matter of practice (i.e., as a statement of what's truly customary), nor does it accord with how courts have recognized the internet has worked since its inception." *Godun*, 135 F.4th at 714 (Nelson, J., concurring). Judge Nelson cautioned that "district courts, future panels, and practitioners should take care not to allow dicta in our precedents—including *Berman*—to be interpreted to freeze the internet in judicial amber. Instead, they should ask how a reasonably prudent internet user would navigate the page ***considering the totality of the circumstances***." *Id.* at 715 (emphasis added). As discussed above, the totality of the circumstances here confirms that the Topps login webpage provides sufficiently conspicuous notice of the Topps Terms when considering the overall design. *See Keebaugh*, 100 F.4th at 1021 ("Unlike the notices at issue in *Berman*, the sign-in screen here lacks clutter and uses '[c]ustomary design elements denoting the existence of a hyperlink.'").

Even if the Court considers *Berman* further, *Berman* does not save Lanzarin's claims from arbitration. The *Berman* court's conclusion that the Terms of Use at issue there were not sufficiently conspicuous was not merely a function of the underlining of the terms at issue in that case. Rather, before the court addressed the underlining issue, the court identified a threshold design flaw: "the text disclosing the existence of the terms and conditions on these websites is the antithesis of conspicuous. It is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked

eye." *Berman,* 30 F.4th at 856-57. The court further explained that "the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text." *Id.* at 857. In the context of barely visible text referring to the Terms of Use, it is understandable why the *Berman* court concluded that the underlining of such text was not sufficiently conspicuous. As shown above, the webpage at issue here does not suffer from the threshold design flaws of the webpages at issue in *Berman*. Thus, *Berman* does not control the outcome here.

The *Sellers* decision on which *Berman* relied similarly does not control the outcome of this case. The *Sellers* court addressed, in relevant part, the enforceability of an arbitration provision in the terms of use for a free trial to a website, which is distinguishable from the login flow process at issue here. *See Sellers*, 73 Cal. App. 5th at 480 ("As discussed, a consumer on the JustAnswer website is not asked to 'sign up' for an account . . ."). The court did not alone rely on the appearance of the hyperlink to conclude that the terms were not sufficiently conspicuous. Rather, the *Sellers* court explained that "[o]n the desktop version, the notice [of contractual terms] appears in extremely small print, outside the white box containing the payment fields where the consumer's attention would necessarily be focused." *Id.* at 480-81. In fact, "[a]lthough the text of the notice appears in white against a dark background, the font is so small that the contrast is not sufficient to make the text apparent." *Id*. at 481. The *Sellers* court also noted that "[f]urther, the hyperlink to the terms of service is underlined, but it is not set apart in any other way that may draw the attention of the consumer, such as with blue text or capital letters." *Id.* Thus, "[c]onsidering ***all of these factors together***, we agree with the trial court that neither of these notices were sufficiently conspicuous to put Plaintiffs on inquiry notice that they would be bound by the terms of service by proceeding with their trial." *Id.* (emphasis added). As discussed above, the webpage at issue here suffers from none of these design flaws.

***Transactional Context.*** The transactional context "is key to determining the expectations of a typical consumer." *Sellers*, 73 Cal. App. 5th at 481. When evaluating the enforceability of sign-in wrap agreements, courts evaluate the full context of the transaction, including whether the transaction contemplated "a continuing, forward-looking relationship" governed by terms of use.

*Id.* at 471; *see also Oberstein*, 60 F.4th at 517 (similar). "[C]ourts should expect that a reasonable internet user is more vigilant in looking for contractual terms when the context of the transaction reasonably implies a contractual relationship." *Godun*, 135 F.4th at 709. "[A] user engaging in a full registration process, as opposed to a one-time purchase, is more likely to expect a continuing relationship that would put her on notice for a link to the terms of that continuing relationship." *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 925 (N.D. Cal. 2024).

The transactional context in this case is not a one-and-done deal, but rather concerns logging into an account that the user has created on the website. This is precisely the sort of situation where it is reasonable to expect that the typical consumer contemplates an ongoing relationship with the website provider that is governed by Terms of Use. *See Sellers*, 73 Cal. App. 5th at 471 (discussing situations where a "consumer [is] signing up for an ongoing account and, thus, it is reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship"); *Keebaugh*, 100 F.4th at 1020 (noting users who download and play a mobile game that includes in-app purchases should expect a continuing relationship with the developer governed by terms of use); *Oberstein*, 60 F.4th at 517 (holding users who make an account with a ticket purchasing website through a "full registration process" should expect "'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship"); *L.W.A. v. LinkedIn Corp.*, 2025 WL 2780788, at *3 (N.D. Cal. Sept. 30, 2025) (similar). Thus, this factor weighs in favor of concluding that the Topps login webpage provides reasonably conspicuous notice of the Topps Terms, including the Arbitration Agreement.

### 2. Lanzarin Unambiguously Manifested Assent To The Topps Terms By Repeatedly Logging Into His Account Multiple Times.

Because the Topps Terms are reasonably conspicuous to a user, the next issue is whether Lanzarin unambiguously manifested his assent to be bound by them. *Berman*, 30 F.4th at 857. "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id.* (citation omitted). "[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858. "Explicit

advisement generally looks like an explanatory clause, usually at the beginning of an advisal—for example: '*By clicking* the Continue >> button, you agree to the Terms & Conditions,' or '*By tapping* 'Play' I agree to the Terms of Service.'" *Godun*, 135 F.4th at 711 (first quoting *Berman*, 30 F.4th at 858, and then quoting *Keebaugh*, 100 F.4th at 1009, 1020) (emphasis in original)).

As part of the Topps login flow, a user receives the following disclosure directly under the "Log In" button: "By continuing, you agree to the Topps Terms and Privacy Policy." Ex. 1 at 3; *see also* Craig Decl. ¶ 14. The word "Terms" in the disclosure is hyperlinked and, if clicked, would have presented Lanzarin with the full text of the Topps Terms, including the Arbitration Agreement. The language under the "Log In" button would have explicitly advised Lanzarin that if he continued with his login, he would agree to the Topps Terms. This language is analogous to language approved by the Ninth Circuit as sufficient to explicitly notify a user that the act of clicking would constitute assent to the Topps Terms. *See Oberstein*, 60 F.4th at 515-16 (considering text that informed the user that, by clicking this button, "you agree to our Terms of Use" or "[b]y continuing past this page, you agree to the Terms of Use"). Lanzarin unambiguously manifested assent to the Topps Terms, including the Arbitration Agreement, by logging into his account. As discussed, Lanzarin logged into his account on the Topps website six times between October 31, 2025 and December 23, 2025. Craig Decl. ¶ 5. By doing so, he repeatedly assented to the Topps Terms, including the Arbitration Agreement. *See Kroskey*, 2025 WL 1507091, at *4 (plaintiff manifested assent where "[t]he notice stated that '[b]y creating your account, you agree to Balance's Terms & Conditions and Privacy Policy,' and Plaintiff proceeded to create an account").

Thus, if the Court were to apply California law rather than New York law, the Court should conclude nonetheless that Lanzarin assented to the Topps Terms, including the Arbitration Agreement. The result remains the same: the Court should hold Lanzarin to the terms of the Agreement and compel arbitration of his claims.

### D. The Delegation Clause Bars Plaintiff From Challenging The Scope Or Enforceability Of The Arbitration Agreement Here.

The Delegation Clause in the Arbitration Agreement bars any attempt by Plaintiff to seek judicial resolution of any challenge he may seek to raise concerning arbitrability. "[L]anguage

delegating to the arbitrators the authority to determine the validity or application of any of the provisions of the arbitration clause constitutes an agreement to arbitrate threshold issues concerning the arbitration agreement." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (citation omitted) (cleaned up). This Court has explained that "[i]f the parties' contract delegates the question of arbitrability to an arbitrator, courts must defer to the parties' contract and respect that decision. The party seeking to compel arbitration must only show that a valid arbitration agreement exists, which delegates the arbitrability issue to an arbitrator." *Needleman v. Golden 1 Credit Union*, 474 F. Supp. 3d 1097, 1105 (N.D. Cal. 2020) (Seeborg, J.).

The Arbitration Agreement includes a Delegation Clause that delegates arbitrability questions to the arbitrator as follows:

> in the event of any Dispute concerning or relating to this Arbitration Agreement — including the scope, validity, enforceability, or severability of this Arbitration Agreement or its provisions, as well as the arbitrability of any claims—you and Topps agree and delegate to the Arbitrator the exclusive jurisdiction to rule on their own jurisdiction over the Dispute, including any objections with respect to the scope, validity, enforceability, or severability of this Arbitration Agreement or its provisions, as well as the arbitrability of any claims or counterclaims presented as part of the Dispute.

Craig Decl. Ex. 3 at 23, § 18.2. This language clearly and unmistakably delegates decisions about threshold issues and the arbitrability of claims to the Arbitrator. *See Aceves v. Autonation, Inc.*, 317 F. App'x 665, 666 (9th Cir. 2009) (collecting cases) (explaining that multiple courts have found language that "any claims . . . including the validity, enforceability or scope of the Arbitration Provision . . . are subject to arbitration" clearly and unmistakably sends questions of arbitrability to the arbitrator). Courts routinely enforce delegation clauses with similar or identical language. *See, e.g., Mohamed*, 848 F.3d at 1201; *Singh v. Adobe Inc.*, 797 F. Supp. 3d 1038, 1050-51 (N.D. Cal. 2025).

To the extent that Plaintiff seeks to challenge the enforceability of the Delegation Clause, he "must specifically reference the delegation provision and make arguments challenging it." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1011 (9th Cir. 2023). Plaintiff will be unable to show that the Delegation Clause is unconscionable.

Under California law, a provision must be both procedurally and substantively

unconscionable to be unenforceable. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (Cal. 2000). The same is true under New York law. *See Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988) ("A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made."). "Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 125 (2019). "Procedural unconscionability concerns the manner in which the contract was negotiated and the respective circumstances of the parties at that time, focusing on the level of oppression and surprise involved in the agreement." *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013).

Plaintiff cannot show that the Delegation Clause is procedurally unconscionable. An arbitration agreement is not procedurally unconscionable when the plaintiff "had the opportunity to opt out." *Harper v. Charter Communications, LLC*, 2019 WL 6918280, at *5 (E.D. Cal. Dec. 19, 2019) (citing *Kilgore v. KeyBank, Natl. Ass'n*, 718 F. 3d 1052, 1059 (9th Cir. 2013)); *Mohamed*, 848 F.3d at 1211 ("[A]n arbitration agreement is not adhesive if there is an opportunity to opt out of it."). The Arbitration Agreement provided Lanzarin with the opportunity to opt out of arbitration.[4] He did not do so. Craig Decl. ¶ 26. "Because no degree of procedural unconscionability is present, the Court does not reach [any] arguments regarding substantive unconscionability." *Shugars v. Walmart Inc.*, 2025 WL 786348, at *7 (N.D. Cal. Mar. 12, 2025). Thus, the arbitrator alone may resolve any challenges to the validity and scope of the Arbitration Agreement.

**E. The Court Should Stay The Case Pending Arbitration.**

The Court should stay this case during the pendency of the arbitration, as mandated by the FAA. 9 U.S.C. § 3; *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the

---

[4] Craig Decl. Ex. 3 at 27 ("18.11.2. OPT-OUT. IF YOU DO NOT WISH TO AGREE TO THE PROVISIONS OF THIS ARBITRATION AGREEMENT AND CLASS ACTION WAIVER AND HAVE NOT PREVIOUSLY AGREED TO AN ARBITRATION PROVISION IN CONNECTION WITH YOUR USE OF OUR SERVICE YOU MUST, WITHIN THIRTY (30) DAYS OF ENTERING INTO THIS AGREEMENT, SEND A WRITTEN NOTICE TO OPT-OUT-ARB@COLLECTFANATICS.COM.").

FAA compels the court to stay the proceeding."); *Singh*, 797 F. Supp. 3d at 1051 (staying case during pendency of arbitration); *Bonhomme v. Uber Techs., Inc.*, 2025 WL 1745729, at *4 (N.D. Cal. June 24, 2025) (same).

## V. CONCLUSION

For the foregoing reasons, Topps requests that the Court compel arbitration of Lanzarin's claims and stay the case pending resolution of arbitration.

Dated: April 16, 2026

COOLEY LLP

*/s/ Matthew D. Brown*
Matthew D. Brown
Attorneys for Defendant
THE TOPPS COMPANY, INC.