UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIEL LANZARIN,

Plaintiff,

v.

THE TOPPS COMPANY, INC.,

Defendant.

Case No. 26-cv-00063-RS

**ORDER DENYING MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

## I. INTRODUCTION

Defendant The Topps Company, Inc. ("Topps") moves to compel arbitration of all claims asserted against Topps by Plaintiff Daniel Lanzarin. In this putative class action, Plaintiff alleges that Topps unlawfully intercepted his electronic communications with the Topps website. Topps argues that Plaintiff agreed to be bound by Topps' terms of use, which includes an agreement to arbitrate claims of this type. Topps contends that he signed up for a Topps account and each subsequent time he logged into that account a warning appeared in the Topps sign-in flow indicating that by continuing, users agree to Topps' terms. For the reasons discussed below, however, this warning and Topps' terms are not displayed in a sufficiently conspicuous manner according to notice standards in California. Accordingly, no agreement to be bound, including to Topps' arbitration terms, was made. Defendant's motion to compel arbitration is therefore denied.[1]

---

[1] Defendant's request to stay all proceedings pending arbitration is also denied.

## II. BACKGROUND

Defendant Topps is a Delaware corporation headquartered in New York City that operates a website through which customers can buy trading cards and other collectibles. Plaintiff, a resident of Belmont, California, purchased the 2025 "Topps Now" World Series Shohei trading card via the Topps website in October 2025.

According to Defendant, Plaintiff made his first Topps purchase in August 2022 and has had a Topps account since that time. In the user flow for logging into a Topps account on a desktop computer or mobile device, a user reaches a log-in page where they must enter their password and click "Log In." Immediately below the "Log In" button text reads, "By continuing, you agree to the Topps Terms and Privacy Policy." Clicking on "Terms" opens a new tab in a web browser, which displays the Topps Terms last updated on September 5, 2025. According to Defendant, Plaintiff logged into his Topps account at various times between making the October 2025 purchase and the filing of this complaint.

The Topps Terms explain, before the table of contents, that they "contain the binding terms and conditions between you and The Topps Company, Inc. ('Topps') applicable [to] your access to and use of this website, www.Topps.com." Dkt. 25-5, Craig Decl., Ex. 3. This introductory section also includes the following notice regarding arbitration provisions:

> PLEASE NOTE THAT THESE TERMS INCLUDE A MANDATORY ARBITRATION PROVISION WHICH REQUIRES THAT ANY PAST, PENDING, OR FUTURE DISPUTES BETWEEN YOU AND US SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION ON AN INDIVIDUAL BASIS . . . .

*Id*. The full Arbitration Agreement is found in Section 18 under the bolded header, "**BINDING ARBITRATION AND CLASS ACTION WAIVER AGREEMENT.**" *Id.* § 18. Section 18.2 sets out the scope of the agreement to arbitrate: "You and Topps agree that any past, pending, or future dispute, claim or controversy arising out of or relating to any purchase or transaction by you… shall be determined by arbitration, including claims that arose before acceptance of any version of this Arbitration Agreement." *Id.* § 18.2. The Arbitration Agreement also includes a Delegation Clause: "[I]n the event of any Dispute concerning or relating to this Arbitration Agreement — including the scope, validity, enforceability, or severability of this Arbitration

Agreement or its provisions, as well as the arbitrability of any claims—you and Topps agree and delegate to the Arbitrator the exclusive jurisdiction to rule on their own jurisdiction over the Dispute[.]" *Id.* The Arbitration Agreement also contains a waiver of class relief and collective action, *id.* § 18.12, and a New York choice of law provision, *id.* § 18.7.

The Arbitration Agreement applies to any claims a user may have currently and those she may raise in the future but includes a process for opting out. *Id.* § 18, Introduction. A user who has not previously agreed to an arbitration agreement with Topps can send a written opt-out notice top opt-out-arb@collectfanatics.com within thirty days of entering the agreement. *Id.* § 18.11. According to Defendant, Plaintiff did not opt out of the Arbitration Agreement.

### III. LEGAL STANDARD

Because the arbitration agreement set forth by Topps is "a contract evidencing a transaction involving commerce," it is subject to the Federal Arbitration Act ("FAA"). 9 U.S.C. §2; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "The FAA provides that any arbitration agreement within its scope 'shall be valid, irrevocable, and enforceable,' …and permits a party 'aggrieved by the alleged… refusal of another to arbitrate' to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron*, 207 F.3d at 1130 (quoting 9 U.S.C. § 4). "Though the FAA reflects an emphatic federal policy in favor of arbitral dispute resolution that requires courts to rigorously enforce agreements to arbitrate, it does not require parties to arbitrate when they have not agreed to do so[.]" *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023) (internal quotation marks and citations omitted).

Therefore, a district court's role under the FAA is to determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron*, 207 F.3d at 1130 (citations omitted). There must be an "express, unequivocal agreement to that effect." *Three Valleys Mun. Water Dist. v. E.F. Hutton Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991). The party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Johnson*, 57 F.4th at 681. " '[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor of

arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made.' " *Id.* 680–681 (quoting *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743 (9th Cir. 2014)). If the party seeking to compel arbitration successfully demonstrates a valid agreement encompassing the dispute, a court must hold the parties to that arbitration agreement. *See, e.g., Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1014.

## IV. DISCUSSION

### A. Formation of a Valid Agreement

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate th[e] dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 '(1985). Notwithstanding Defendant's contrary arguments, California law governs the question of contract formation irrespective of the New York choice of law provision in the Topps Terms. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) ("Whether the choice of law provision applies depends on whether the parties agreed to be bound by Barnes & Noble's Terms of Use in the first place."). *See also Penning v. Nvidia Corp.*, No. 25-CV-09160-SVK, 2026 WL 1433313, at *4 (N.D. Cal. May 21, 2026) ("The Court finds that California law governs the question of contract formation notwithstanding the Delaware choice of law provision in Defendant's Terms of Service."). "To form a contract under California… law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) (quoting *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023)).

Companies interreacting with users online generally provide notice of contractual terms through either clickwrap, browsewrap, or sign-in wrap agreements, not all of which are adequate for actual or constructive notice. A clickwrap agreement is one in which "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). This is generally considered by courts to provide sufficient contractual notice. *See id.* "At the other end of the spectrum are so-called 'browsewrap' agreements, in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those

terms simply by continuing to use the website." *Id.* Sign-in wrap agreements fall in-between: "the website provides a link to [its] terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Chabolla*, 129 F.4th at 1154 (citing *Keebaugh*, 100 F.4th at 1014).

Here, Topps employs sign-in wrap agreements. "Under California law, a sign-in wrap agreement may be an enforceable contract based on inquiry notice if (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (internal quotation marks omitted).

### 1. Reasonably Conspicuous Notice

"The context of the transaction, as well as the traditional inquiry related to the visuals involved with the notice, such as font size, text placement, and overall screen design, inform whether a website provides reasonably conspicuous notice of the terms of an agreement." *Chabolla*, 129 F.4th at 1155 (internal quotation marks and citations omitted). Here, both weigh in favor of reasonably conspicuous notice.

#### a. Transactional Context

"[T]he full context of any transaction is critical to determining whether any particular notice is sufficient to put a consumer on inquiry notice of contractual terms contained on a separate, hyperlinked page." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 453, 289 Cal. Rptr. 3d 1, 5 (2021). "[U]ser[s] should expect that certain relationships are bound by terms, even if not explicitly told," such as "users who download and play a mobile game that includes in-app purchases" or "users who make an account with a ticket purchasing website through a full registration process." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1155 (9th Cir. 2025) (citing *Keebaugh*, 100 F.4th at 1020 and *Oberstein*, 60 F.4th at 517). In fact, "the majority of the federal cases finding an enforceable sign-in wrap agreement involve continuing, forward-looking relationships." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 476, 289 Cal. Rptr. 3d 1, 26 (2021).

"Conversely, when a user simply purchases goods or avails herself of a one-time discount offer, there is less reason for her to expect a continued relationship beyond the purchase." *Chabolla*, 129 F.4th at 1155. Even when the transactional context falls in-between these endpoints, such as when users sign up for a free trial of workout classes or expert advice, the Ninth Circuit and Supreme Court have held that the nature of the transaction insufficiently alerted users to look for additional terms. *Id.* at 1156; *Sellers*, 73 Cal. App. at 480.

Plaintiff here made his first purchase from Topps in August 2022, and "[t]o make this purchase, Mr. Lanzarin would have registered for a Topps account on or before that date." Dkt. 25-2, Craig Decl., ¶ 6. In *Oberstein*, the Ninth Circuit considered online ticket purchases that "require[ed] a full [account] registration process" which included a "confirmation button" and warnings that made clear that by clicking the registration button, "you agree to our Terms of Use." F.4th at 517. The Ninth Circuit held that this purchasing process "reflected the contemplation of some sort of continuing relationship that would have put users on notice for a link to the terms of that continuing relationship." *Id.* (internal quotation marks and citation omitted). Defendant here provides no information or documentation regarding Topps account registration—not even whether registration includes terms of use warnings or requires confirmation of the Topps Terms. In fact, Plaintiff contends that "the sign-in process is entirely independent from the checkout process," Dkt. 26, Opp., at 18. On the other hand, Plaintiff logged into the account numerous times before and after his October 2025, evincing at least some sort of ongoing relationship.

In sum, although a one-time purchase generally does not put a user on notice of an ongoing relationship of the type accompanied by terms and conditions, Plaintiff did register an account with Topps which he accessed repeatedly. Thus, an ongoing relationship existed, and the transactional context weighs in favor of notice—at least slightly so.

**b. Visuals**

"Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman*, 30 F.4th at 857. While terms may be disclosed through hyperlinks, "the fact that a hyperlink is present must be readily apparent." *Berman*, 30 F.4th at 856. " '[S]imply

underscoring words or phrases… will often be insufficient to alert a reasonably prudent user that a clickable link exists.' " *Keebaugh*, 100 F.4th at 1014 (quoting *Berman*, 30 F.4th at 857). Consumers should not have to "ferret out hyperlinks[.]" *Berman*, 30 F.4th at 857.

However, these are not brightline rules. Courts look to " 'the conspicuousness and placement of the Terms of Use hyperlink, other notices given to users of the terms of use, and the website's general design' in determining 'whether a reasonably prudent user would have inquiry notice of a [sign-in wrap] agreement.' " *Oberstein*, 60 F.4th at 515 (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)). *See also Keebaugh*, 100 F.4th at 1020–21 (applying *Berman* and *Oberstein* to a sign-in wrap agreement). Factors considered in a recent line of Ninth Circuit cases include the user's natural flow through the website; notice font size, especially relative to other parts of the page; notice font color, especially whether the color stands out or blends in; presence of other distracting visual elements and visual "clutter"; and notice placement and proximity to the page's main action button or item. *See Chabolla*, 129 F.4th at 1152, 1157; *Burman*, 30 F.4th at 856–57; *Oberstein*, F.4th at 516–17; *Patrick v. Running Warehouse*, 93 F.4th 468, 477 (9th Cir. 2024).

Here, the desktop and mobile browser pages on which Topps' notices appear are simple and uncluttered. Moreover, the notices are not in smaller text or otherwise hidden. However, the other design elements are not tailored to give notice.



**Desktop Login Page 1: Enter Email**



**Desktop Login Page 2: Enter Password**





**Mobile Login Page 1: Enter Email**     **Mobile Login Page 2: Enter Password**

Despite including three and four lines of explanatory text (on desktop and mobile, respectively) telling users they need to enter their email to continue, the first page of the Topps login flow makes no mention that users will be agreeing to the Topps Terms and Privacy Policy by continuing to login. Moreover, the second page of the login flow, which does include some notice, looks extremely similar to the first page, making it easier for a user to miss the new warning that "By continuing, you agree to the Topps Terms and Privacy Policy." Additionally, the notice text is unbolded and black, the same color as the rest of the text on the enter-email and enter-password pages. The notice text is also the same color that the enter-password page's main action button, "Log In," changes to once a password has been entered. Most notably, the notice's hyperlinks to the Topps Terms and Privacy Policy are the same color as the rest of the text and are only noted by an underline—directly contrary to the guidance given by the Ninth Circuit in *Berman*. *See* 30 F.4th at 856–57.

Finally, while the notice is near the "Log In" button, it is separated from the textbox into which a user inputs their password by two large features. Those features are a "Reset Password" link, which is bolded, and the large "Log In" button which consists of a grey or black oval, depending on whether the password has been entered, with the text "Log In" in white, a color that contrasts with the button's grey or black background. A user's attention is likely to be on the textbox because entering a password is the primary action the page asks of the user, and it is the action a user must take to proceed to their purchase. Focus is drawn secondarily to the "Log In" button, which is emphasized by its size, background color, and the fact that it switches color. With focus drawn on these two places, the textbox and "Log In" button, it would not be hard for a user to miss the notice and hyperlinks, whose placement, size, color, and unbolded style are relatively inconspicuous.

To be sure, the analysis here is close. The ongoing relationship, lack of clutter on the notice page, and consistent text sizing weigh in Topps' favor. The notice and terms are not actively hidden in especially small font, especially faint color, or a corner of the page. However, the remaining design elements reflect no effort to draw attention to the notice and hyperlinks. The standard is not whether Topps hid the terms to which it asserts Plaintiff assented but whether Topps gave notice that is reasonably *conspicuous*. Users should not have to "ferret out" the terms to which they are expected to assent. *Berman*, 30 F.4th at 857.  Here, they do.

In short, the overall design of the visual elements of the notice, even with an ongoing relationship, are insufficient for reasonable conspicuousness. This "lack of notice is dispositive," so it is not necessary to analyze whether Plaintiff unambiguously manifested assent. *See Lee*, 773 F.Supp.3d at 766.

### V. CONCLUSION

For the foregoing reasons, Topps motion to compel arbitration is denied.

CASE NO. 26-cv-00063-RS

**IT IS SO ORDERED**.

Dated: June 29, 2026

_____
RICHARD SEEBORG
Chief United States District Judge